### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| COVENTRY FIRST, LLC, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| J. PATRICK INGRASSIA, | : | No. 05-2802 |
| Defendant. | : | |

### MEMORANDUM AND ORDER

**Schiller, J.**                                                                                      **July 11, 2005**

On June 13, 2005, Plaintiff Coventry First, LLC ("Coventry") filed this action for injunctive relief against one of its former employees, Defendant J. Patrick Ingrassia. Presently before the Court is Coventry's motion for a preliminary injunction. Coventry contends that Ingrassia is competing with Coventry, interfering with Coventry's customer relationships, and disclosing Coventry's confidential information, and seeks to enjoin Ingrassia from conducting such activities. Following an evidentiary hearing on June 24, 2005, the Court now enters the following Findings of Fact and Conclusions of Law as required by Federal Rule of Civil Procedure 52(a). For the reasons set forth below, Coventry's motion is granted in part and denied in part.[1]

## I.      FINDINGS OF FACT

### A.      Coventry's Business

Coventry is a major player in the life settlement industry, a relatively new and maturing field.

---

[1] Coventry also filed a motion for a temporary restraining order, which, in light of the Court's resolution of the preliminary injunction motion, is now moot. Both motions were addressed at the June 24, 2005 evidentiary hearing.

(R. at 6, 14, 92 (June 24, 2005).)  Life settlements are "solutions for clients that have life insurance and have determined that they don't need the insurance."  (*Id.* at 6-9.)  These individuals can sell their policies to life settlement providers, such as Coventry, instead of surrendering them to their life insurance carriers for cash value.  (*Id.*)  For example, if a policy has a cash value of $50,000 and a death benefit of $250,000, Coventry will "look at that policy as an asset and appraise that asset and see if [it] value[s] that policy to be greater than the cash value."  (*Id.* at 7.)  If so, Coventry will pay the policyholder a sum of money above the $50,000 and hold the policy as an asset.  (*Id.* at 7-8.)

Coventry depends on a network of "producers" and "managing general agents" to bring in business.  (*Id.* at 10, 80-81, 93.)  Producers are typically life insurance agents, CPAs, or financial planners, and they refer policyholders directly to Coventry.  (*Id.* at 53, 81.)  Managing general agents have their own networks of producers, through which they procure referrals to pass along to Coventry.  (*Id.* at 80.)  Managing general agents sign non-exclusive agreements with Coventry, which means they may "shop" their policies to Coventry and its competitors to get the best price. (*See* Def.'s Hr'g Ex. E (Managing General Agent Agreement Between Coventry and Bill S. Wolfkiel).)  Coventry has found that working with producers is generally more cost efficient than working with managing general agents, because Coventry then has to pay a commission to only one party. (Compl. ¶ 16.)  Thus, Coventry avers, it not only works with its managing general agents, but also competes with them to establish relationships with producers.  (*Id.* ¶ 18.)  Because only "high level" individuals "have the expertise to understand" life settlement solutions, there is a finite group of available producers.  (R. at 14-15 (June 24, 2005).)

**B.      Ingrassia's Employment with Coventry**

In 2003, a recruiter brought Ingrassia's resume to Coventry.  (*Id.* at 15, 168-69.)  Ingrassia

2

had no previous experience in the life settlement industry, but had spent six years working for AIG/SunAmerica, where his responsibilities included selling mutual funds and annuities in various regions of the United States. (*Id.* at 16, 62-67; Def.'s Hr'g Ex. F (American Wealth Transfer Group, LLLP Promotional Brochure).)

After reviewing Ingrassia's resume, Michael Coben, Coventry's Senior Vice President of Account Services, contacted him about a possible job as a Regional Vice President. (R. at 11, 15-16 (June 24, 2005).) Over the course of their discussions, Ingrassia asked Coben for a sales territory that included Arizona, the state where he resided. (*Id.* at 16, 168-70.) On May 20, 2003, Coventry formally offered Ingrassia a Regional Vice President position. (Pl.'s Hr'g Ex. 1 (Letter of May 20, 2003).) Ingrassia accepted this offer and began work on June 24, 2003. (R. at 176 (June 24, 2005).) Despite Ingrassia's request to work in Arizona, Coventry assigned him Colorado, Wyoming, Nebraska, Kansas, and Missouri. (*Id.* at 17, 178; *see also* Def.'s Hr'g Ex. A (Map of Coventry Territories).) Ingrassia maintained his Arizona residence but, for his convenience, leased an apartment near Coventry's headquarters in Pennsylvania. (R. at 176-77 (June 24, 2005).)

Ingrassia's job duties required him to build relationships with producers in his territory. (*Id.* at 11, 14.) Ingrassia explained that his "main objective" was to "meet people . . . talk to them, learn about their business . . . [a]nd then find out if there [were] potentially life settlement opportunities." (*Id.* at 191.) He was not involved in the financial underwriting side of Coventry's business. (*Id.* at 181, 192.) In fact, Ingrassia describes himself as a "relationship guy" who did not "care to know" all the complexities of what Coventry does. (*Id.* at 180-81.) Ingrassia did receive several months of training at Coventry's Philadelphia facilities. (*Id.* at 19-20, 171-72.) That training program, though, grouped Ingrassia with "folks that were right out of college, that had absolutely no

experience in the industry." (*Id.* at 215.)  Thus, while Coben characterized the training program as "very intense," Ingrassia felt that it was "very general." (*Id.* at 19, 215.)

### C.    The Non-Competition Agreement

On May 22, 2003, shortly before starting at Coventry, Ingrassia signed a non-disclosure and non-competition agreement (the "Non-Competition Agreement").  (Def.'s Hr'g Ex. C (Non-Competition Agreement).)  The Non-Competition Agreement is "a standard noncompete that all Coventry [] employees sign prior to coming on board."  (R. at 25 (June 24, 2005).)  Ingrassia testified that he "looked it over"; however, he also stated that he "probably didn't understand a ton of it." (*Id.* at 174.)  The Non-Competition Agreement contains, inter alia, a non-compete clause, a non-interference clause, and a confidentiality clause.  (Def.'s Hr'g Ex. C.)

#### 1.     *The Non-Compete Clause*

The non-compete clause purports to apply during Ingrassia's employment with Coventry and for three years after the termination of his employment.  The clause provides that:

> From and including Employee's first date of employment with Employer ("Start Date") through and including the last date of such employment ("Termination Date") (this time period is collectively the "Employment Period"), and for three (3) years thereafter (the Employment Period and the three (3) years thereafter are collectively the "Restricted Period"), except as expressly consented to in writing in advance by Employer, which consent Employer may withhold in its sole discretion, Employee shall not engage in Competition (as defined below) with Coventry.

(*Id.* ¶ 4(a).)  "Competition" is defined as engaging in or working for a company that engages in the same or similar business as Coventry throughout the United States, Puerto Rico, and Canada. Specifically, the clause states that:

> For purposes of this Agreement, "Competition" by Employee shall mean *Employee's engaging in, or otherwise directly or indirectly being employed by* or acting as a consultant or lender to, or being a director, officer, employee, principal, licensor,

trustee, broker, agent, stockholder, member, owner, joint venturer, partner or independent contractor of, or permitting Employee's name to be used in connection with the activities of *any other business or organization which is engaged in the same or similar business as Coventry,* as the same shall be constituted at any time during or following the Employment Period, *in the United States, Puerto Rico or Canada,* and which business also includes any new product or service that is or was in development by Coventry during the Employment Period, if such product or service is transacted in business by Coventry at any time during the Restricted Period; provided that, it shall not be a violation of this Agreement for Employee to become the registered or beneficial owner of less than one percent (1%) of any class of the capital stock of a competing corporation registered under the Securities Exchange Act of 1934, as amended.

(*Id.* (emphasis added).)

> 2.    *The Non-Interference Clause*

The non-interference clause also purports to apply during Ingrassia's employment with Coventry and for three years after his termination.  The non-interference clause provides as follows:

During the Restricted Period, except as expressly consented to in writing in advance by Employer, which consent Employer may withhold in its sole discretion, Employee shall not, at any time, in any way or for any reason*,* interfere with any of Coventry's existing or prospective relationships with its existing or prospective employees, consultants, customers, brokers, agents, producers, financing sources or any other existing or prospective business relationships, or otherwise contact, solicit, induce or influence any such Person to Coventry's detriment.

(*Id.* ¶ 4(b).)

> 3.    *The Confidentiality Clause*

Finally, the Non-Competition Agreement contains a clause that attempts to limit Ingrassia's use or disclosure of Coventry's confidential information.  This confidentiality clause purports to apply in perpetuity.  It states as follows:

During the Unlimited Period, except as expressly consented to in writing in advance by Employer, which consent Employer may withhold in its sole discretion, Employee

5

> agrees that (i) Employee shall at all times maintain all Confidential Information in the strictest of confidence, (ii) Employee shall not, at any time, in any way or for any reason, (1) disclose, disseminate, publish, permit access to, reveal, transfer or discuss any Confidential Information to or with any Person (except, during the Employment Period, as authorized by Employer and for the sole purpose of advancing Coventry's interests), (2) copy, duplicate, otherwise reproduce, download, transmit by mail, computer, telephone or otherwise remove any Confidential Information from Coventry's premises or use any Confidential Information (except, during the Employment Period, as authorized by Employer and for the sole purpose of advancing Coventry's interests), or (3) use, misuse or exploit any Confidential Information to compete with or adversely affect the business or operations of Coventry in any way.

(*Id.* ¶ 4(c)(ii).)  The confidentiality clause also provides that Ingrassia must return all of Coventry's confidential information upon termination:

> Upon the Termination Date and/or upon request by Employer, at any time during the Unlimited Period and for any reason, Employee shall promptly return to Coventry the original and all copies of all non-oral Confidential Information.  Employee shall not retain any copies, extracts or other reproductions in whole or in part of such written materials.  All Confidential Information that is contained in electronic or computerized format shall promptly be returned to Coventry, and Employee's copy shall be deleted irretrievably.  All oral Confidential Information shall be held by Employee in strictest confidence, and shall continue to be subject to the terms of this Agreement.  Employee shall also, upon request, promptly certify by sworn affidavit Employee's compliance with this and every provision of this Agreement.

(*Id.* ¶ 4(c)(iii).)

### D.    Ingrassia's Termination

On December 3, 2004, Coben, with the approval of Reid Buerger, Coventry's Executive Vice President, fired Ingrassia.  (R. at 22, 57, 91, 99, 185 (June 24, 2005).)  The basis for Ingrassia's termination was his "[p]erformance, relative to his peers," more specifically, "the inadequate level of business that [he] brought in."  (*Id.* at 22-23.)  Although Ingrassia was excellent at building relationships and "[got] along very well with producers," he often had trouble when it came to managing cases and closing the deal.  (*Id.* at 23, 97, 192-93.)  In 2004, he only closed about twenty

6

cases, totaling $50 million, a small figure by Coventry's standards. (*Id.* at 43-44.) This figure placed Ingrassia last among the Regional Vice Presidents working at Coventry that year. (*Id.* at 43.)

Ingrassia did not expect to be fired from Coventry. (*Id.* at 186.) Although Ingrassia conceeds that he was not "a big case guy," he does not believe that he was "doing worse than everybody else that started at the same time." (*Id.* at 183-84.) Coben concurs that, upon receiving news of his termination, Ingrassia was very disappointed and wanted an opportunity to stay. (*Id.* at 25.) Coben rejected his request and, notwithstanding his disappointment, Ingrassia entered into a severance agreement and general release (the "Severance Agreement"). (*Id.*; Pl.'s Hr'g Ex. 3 (Severance Agreement).) Under the Severance Agreement, which Ingrassia signed on December 13, 2004, Coventry paid Ingrassia $25,000 in severance. (Pl.'s Hr'g Ex. 3.) Ingrassia, in exchange, released all his potential claims against the company and agreed to comply with the terms of his Non-Competition Agreement. (*Id.*)

### E.   Ingrassia's Post-Employment Activities

Coventry contends that Ingrassia has violated his Non-Competition Agreement despite his promise to abide by it.

#### 1.   *Services for Bill S. Wolfkiel*

First, Coventry asserts that Ingrassia has performed and is currently performing services for Bill S. Wolfkiel, a managing general agent from Colorado who has a non-exclusive agreement with Coventry. (R. at 100 (June 24, 2005); Def.'s Hr'g Ex. E.) Ingrassia did not have a personal relationship with Wolfkiel prior to working at Coventry. (R. at 221 (June 24, 2005).) During his employment with Coventry, Ingrassia occasionally referred life settlement opportunities to Wolfkiel. (*Id.* at 235.) Ingrassia contends that such referrals were proper because he only made them in

instances where the policy was too small for Coventry to be interested. (*Id.* at 194-96.) Typically, Coventry only seeks policies that are worth $250,000 or more. (*Id.* at 54-55, 196.)

Yet, it is undisputed that Ingrassia referred one case to Wolfkiel, known as the "Maizlish" case, which was worth $15 million. (*Id.* at 104-05, 235-36.) Matt Veatch, a producer in Ingrassia's territory, initially submitted this case to Coventry. (*Id.*) Buerger recently reviewed Coventry's files and concluded that Ingrassia did little work on the Maizlish case. (*Id.* at 102-04.) Ingrassia's apparent neglect of the case struck Buerger as unusual, especially because it had such a large monetary value. (*Id.*) Veatch eventually submitted the Maizlish case to Wolfkiel, who sold it to one of Coventry's competitors. (*Id.* at 106-08.) Veatch, who did not know Wolfkiel before producing the case, had obtained Wolfkiel's name from Ingrassia. (*Id.* at 235-36; Wolfkiel Dep. at 25.)

Since being terminated from Coventry, Ingrassia has started his own company, Valued Solutions Group, LLC. (R. at 188-89 (June 24, 2005).) He has also become associated with Wolfkiel's financial services firm, American Wealth Transfer Group, LLLP ("AWTG"). (Def.'s Hr'g Ex. F.) AWTG specializes in strategic business planning, senior settlement, estate and charitable planning, executive/employee benefits, and wealth transfer. (*Id.*) The firm has no revenues of its own and is "strictly a DBA [("doing business as")] for the purpose of several professionals." (Wolfkiel Dep. at 8.) Ingrassia asked Wolfkiel to include him on AWTG's brochure in order to "add to credibility." (R. at 207 (June 24, 2005).) The brochure identifies Ingrassia as AWTG's "Senior Vice President of Marketing" and states that Ingrassia manages the firm's Scottsdale, Arizona office. (Def.'s Hr'g Ex. F.)

Although Wolfkiel has not entered into any agreements with Ingrassia regarding the life settlement business, Wolfkiel and Ingrassia have discussed doing such business in the future.

(Wolfkiel Dep. at 5, 11-12). Prior to the commencement of this lawsuit, Wolfkiel believed that "the life settlement industry was an area where . . . [Ingrassia] might fit within [his] group." (*Id.* at 13-14.) Wolfkiel has even made two "advances" or "gifts" to Ingrassia of $50,000 and $212,000, respectively. (*Id.* at 26-28.) Wolfkiel and Ingrassia deny any connection between these payments and Ingrassia's involvement in the Maizlish case. (*Id.*; R. at 236 (June 24, 2005).) At the very least, however, Wolfkiel and Ingrassia admit that the payments were made in anticipation of conducting future business dealings together, potentially in the realm of life settlements.[2] (Wolfkiel Dep. at 26-28; R. at 229-31 (June 24, 2005).)

2.      *Coventry's Confidential Information*

Second, Coventry contends that Ingrassia still possesses Coventry's confidential information, which he will inevitably disclose to others in the life settlement business. When he was terminated, Ingrassia failed to return several three-ring binders containing "information on who the producers are in [his] territory, information on the amount of business they've done with [Coventry], information on specific cases that they did for [Coventry], [and] information and lists of not only agents but [also] . . . national distributors." (R. at 27, 82-83 (June 24, 2005).) Ingrassia also left the company with some amount of "intangible" knowledge. (*Id.* at 83.) According to Coben, the life settlement industry is "a brand new industry" which cannot be learned from a book. (*Id.*) Coventry endeavored to teach Ingrassia "the know-how to work with an individual . . . in really understanding

---

[2] There is also some evidence to suggest that, since leaving Coventry, Ingrassia has continued to refer producers to Wolfkiel. For instance, Buerger testified that Coventry received approximately 30-35 cases from Wolfkiel in 2005, which was "a multiple of what [Wolfkiel] had ever [brought] in before." (R. at 102 (June 24, 2005).) Wolfkiel, though, does not recall Ingrassia referring any producers during this time and attributes the case increase to improved marketing techniques. (Wolfkiel Dep. at 23, 31.)

9

the application of this solution, not only in general for his business but specifically for a particular client." (*Id.*)   Coventry also imparted certain information to Ingrassia about underwriting, appraising, and pricing. (*Id.*)

Ingrassia, however, contests Coventry's contention that he has retained any of the company's confidential information. Ingrassia admits that, before going out into his sales territory, he did obtain confidential information from Coventry, including lists of life insurance agents, CPAs, and financial consultants. (*Id.* at 172.)   But when he was fired, Ingrassia turned over his computer and his Blackberry, which contained all of the lists. (*Id.* at 198.)   Ingrassia did not purposely leave with any confidential information and claims that, even if he had, he would have no use for it. (*Id.* at 199.) The three-ring binders to which Coben refers were "put in the car by [Ingrassia's] roommate" and, since discovering the binders, Ingrassia has returned them to Coventry. (*Id.*)   Furthermore, although Ingrassia certainly learned about the life settlement industry from Coventry, he is a people-guy who is best at building relationships. (*Id.* at 23, 97.)   Relationship-building, which Ingrassia felt was the "main objective" of his job, is a skill which he began to develop before joining Coventry. (*Id.* at 191, 215.)   As Ingrassia was not involved in the financial underwriting side of Coventry's business, he contends that any knowledge about underwriting, appraising, and pricing that Coventry imparted was fairly basic and not confidential. (*Id.* at 181-82, 192.)

## II.      STANDARD OF REVIEW

A party seeking a preliminary injunction must show: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest

favors such relief." *Child Evangelism Fellowship of New Jersey, Inc.*, 386 F.3d 514, 524 (3d Cir. 2004) (*quoting KOS Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004)). A preliminary injunction "is an extraordinary remedy and should be granted only in limited circumstances." *KOS Pharms.*, 369 F.3d at 708 (*quoting American Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1426-27 (3d Cir. 1994)).

## III.    DISCUSSION

Applying the preliminary injunction standard to the facts of this case, the Court will enjoin Ingrassia from engaging in the life settlement business in his former sales territory for a period of three years.

### A.    Likelihood of Success on the Merits

Coventry brings claims against Ingrassia for breach of contract, misappropriation of trade secrets, misappropriation of confidential information, and breach of fiduciary duty. (Compl. ¶¶ 71-106.) The success of Coventry's breach of contract claim depends on the validity of Ingrassia's Non-Competition Agreement and on whether Ingrassia breached its terms. The success of Coventry's remaining claims depends on whether Ingrassia has misused confidential information, a question resolved by determining whether he has complied with the agreement's confidentiality clause.

#### 1.    *Validity of the Non-Competition Agreement*

Under Pennsylvania law, a post-employment restrictive covenant is enforceable if: (1) it is ancillary to an employment relationship between the parties; (2) the restrictions imposed are reasonably necessary for the protection of the employer; and (3) the restrictions imposed are reasonably limited in duration and geographic extent. *Insulation Corp. of Am. v. Brobston*, 667 A.2d

11

729, 733 (Pa. Super. Ct. 1995); *see also Hess v. Gebhard & Co.*, 808 A.2d 912, 917 (Pa. 2002).  The

employee bears the burden of establishing the unreasonableness of the covenant and demonstrating

unenforceability.  *Ride the Ducks, L.L.C. v. Duck Boat Tours, Inc.*, Civ. A. No. 04-CV-5595, 2005

WL 670302, at *11, 2005 U.S. Dist. LEXIS 4422, at *36 (E.D. Pa. Mar. 21, 2005) (citations

omitted).  This inquiry "is a factual one, requiring consideration of all the facts and circumstances."

*Wellspan Health v. Bayliss*, 869 A.2d 990, 999 (Pa. Super. Ct. 2005) (*citing Jacobson & Co. v. Int'l*

*Envtl. Corp.*, 235 A.2d 612, 619-20 (Pa. 1967)).  The court "must balance the interest the employer

seeks to protect against the interest of the employee in being able to earn a living in his chosen

occupation."  *Siemens Med. Solutions Health Servs. Corp. v. Carmelengo*, 167 F. Supp. 2d 752, 760

(E.D. Pa. 2001) (*citing All-Pak, Inc. v. Johnston*, 694 A.2d 347, 351 (Pa. Super. Ct. 1997)).   If the

court decides to fashion an injunction to enforce a restrictive covenant, it has "broad powers to

modify the restrictions imposed on the former employee to include only those restrictions reasonably

necessary to protect the employer."  *Id.* (*citing Morgan's Home Equip. Corp. v. Martucci*, 136 A.2d

838, 847 (Pa. 1957)).

### a.   Ancillary to Employment

There is no doubt that the Non-Competition Agreement was "ancillary" to Ingrassia's

employment with Coventry.  The agreement was a "standard noncompete" which Ingrassia signed

shortly before coming on board with the company.  (R. at 25 (June 24, 2005); Def.'s Hr'g Ex. C.)

The restrictive covenant therefore related to his employment and was supported by adequate

consideration, i.e., his position with Coventry.  *See Maint. Specialties, Inc. v. Gottus*, 314 A.2d 279,

282-83 (Pa. 1974) ("When the restrictive covenant is contained in the initial contract of employment,

consideration for the restrictive covenant is the job itself.").  Ingrassia received new consideration

for the covenant after his termination, in the form of $25,000 in severance.  (*See* Pl.'s Hr'g Ex. 3); *see also Brobston*, 667 A.2d at 733 ("for a restrictive covenant entered into subsequent to the commencement of the employee's service to be 'ancillary,' it must be supported by new consideration, which can be in the form of a corresponding benefit").  Thus, both before beginning work and after leaving the company, Ingrassia agreed to abide by the restrictive covenant in exchange for an employment benefit of some type.

> b.      Protection of the Employer

The covenant, however, should have been drawn only as broadly as is necessary to protect Coventry's legitimate business interests.  *See Ride the Ducks*, 2005 WL 670302, at *12 (*citing Worldwide Auditing Servs., Inc. v. Richter*, 587 A.2d 772, 776 (Pa. Super. Ct. 1991)).  Legitimate business interests include, inter alia, protecting trade secrets or confidential information, as well as maintaining customer goodwill.  *Bayliss*, 869 A.2d at 996.  A trade secret is information that gives the employer "an opportunity to obtain an advantage over competitors . . . . [It] does not include a worker's aptitude, his skill, his dexterity, his manual and mental ability, and such other subjective knowledge as he obtains while in the course of his employment."  *Christopher M's Hand Poured Fudge, Inc. v. Hennon*, 699 A.2d 1272, 1275 (Pa. Super. Ct. 1997) (citations and quotations omitted).  Customer goodwill "represents a preexisting relationship arising from a continuous course of business which is expected to continue indefinitely."  *Butler v. Butler*, 663 A.2d 148, 152 n.9 (Pa. 1995).  Goodwill is a protectible interest when it  has been "acquired through the efforts of an employee."  *Sidco Paper Co. v. Aaron*, 351 A.2d 250, 252-53 (Pa. 1976) (collecting cases).

The covenant at issue touches on Coventry's legitimate interests in both of these areas.  The confidentiality clause, for instance, attempts to protect Coventry's trade secrets by requiring Ingrassia

to maintain the company's confidential information in the strictest of confidence and return that information upon termination. (Def.'s Hr'g Ex. C ¶¶ 4(c)(ii), 4(c)(iii).) Coventry disseminates certain information to its employees, like customer lists, that is undisputedly confidential. (*See* R. at 172 (June 24, 2005).) The non-compete and non-interference clauses, moreover, are aimed at preserving Coventry's customer goodwill, as they forbid Ingrassia from competing with Coventry and interfering with Coventry's existing and prospective relationships. (Def.'s Hr'g Ex. C ¶¶ 4(a), 4(b).) Customer goodwill is an especially salient interest here, because Coventry's business depends entirely on referrals, which in turn, depend entirely on Coventry's relationships with producers and managing general agents. (*See* R. at 10, 80-81, 93 (June 24, 2005).) Goodwill is also of particular importance because the life settlement industry is still a new and maturing industry. (*See id.* at 14, 92.)

Nevertheless, the covenant's language is overbroad and reaches beyond what is reasonably necessary to protect Coventry. Most notably, the non-compete clause is unnecessarily onerous because it prohibits Ingrassia not only from "engaging in" the same or similar business as Coventry, but also from "otherwise directly or indirectly being employed by" anyone who engages in this business. (Def.'s Hr'g Ex. C. ¶ 4(a).) It is unreasonable to prevent Ingrassia from associating with any company that, among other things, provides life settlements, for there is no real threat to Coventry from Ingrassia's participation in other aspects of the life insurance industry. As Coben explained, Ingrassia's recent business activities worry Coventry because Ingrassia is great at "building relationships and having existing relationships which he could bring to other individuals." (R. at 28 (June 24, 2005).) Yet, if Ingrassia is forming relationships and making referrals for products other than life settlements, he will not be in competition with Coventry.

14

The covenant's broad language, moreover, must be viewed in an especially critical light because Ingrassia did not leave Coventry voluntarily.  *See Bayliss*, 869 A.2d 999 (stating that the reasonableness inquiry requires "consideration of all the facts and circumstances").  An employer who fires an employee for failing to promote the employer's legitimate business interests "deems the employee worthless.  Once such a determination is made by the employer, the need to protect itself from the former employee is diminished by the fact that the employee's worth to the corporation is presumably insignificant."  *Brobston*, 667 A.2d at 735.  Ingrassia was fired because he brought in "an inadequate level of business."  (R. at 22-23 (June 24, 2005).)  While Ingrassia's relationship-building skills were still of some value to the company, Coventry clearly decided that his deficiencies outweighed his strengths.  (*See id.* at 23, 97.)  As such, Coventry's claim that Ingrassia poses a serious competitive threat is inherently suspect.  *See Brobston*, 667 A.2d at 735.

Accordingly, for purposes of the instant motion, the Court narrows the covenant to permit Ingrassia to work for other persons engaged in the life settlement industry, so long as he does not engage in that industry himself.  *See Siemens*, 167 F. Supp. 2d at 760 (stating that court has "broad powers to modify the restrictions imposed on the former employee to include only those restrictions reasonably necessary to protect the employer").

### c.    Duration and Geography

Additionally, although the covenant is reasonably limited in duration, it is unreasonably expansive in geography.  The non-compete clause prevents Ingrassia from competing with Coventry anywhere in the United States, Puerto Rico, or Canada for three years after his termination.  (Def.'s Hr'g Ex. C ¶ 4(a).)  The Pennsylvania Supreme Court has often upheld three-year covenants not to compete.  *See, e.g.*, *John G. Bryant Co. v. Sling Testing & Repair, Inc.*, 369 A.2d 1164, 1170 (Pa.

1977) (finding three year restriction "reasonably necessary for the protection of the employers to strengthen and reaffirm their business contacts"); *Hayes v. Altman*, 225 A.2d 670, 673 (Pa. 1967) (holding three year restriction reasonable). In light of this precedent, this Court will not alter the three year time restriction imposed here.

There is nothing to suggest, however, that Coventry requires a geographic restriction on Ingrassia which encompasses the United States, Puerto Rico, and Canada. Although some courts have upheld covenants with nationwide territorial scopes, this has typically occurred in cases where the employee *actually serviced* a nationwide market. *See, e.g., Volunteer Fireman's Ins. Servs., Inc. v. Cigna Prop. & Cas. Ins. Agency*, 693 A.2d 1330, 1338 (Pa. Super. Ct. 1997). Ingrassia's territory, however, encompassed only five states: Colorado, Wyoming, Nebraska, Kansas, and Missouri. (R. at 17, 178 (June 24, 2005); Def.'s Hr'g Ex. A.) Coventry has not presented sufficient evidence that, outside this region, Ingrassia could cause the company any harm. Therefore, extending the non-compete clause beyond these five states is unreasonable and cannot be permitted.

Accordingly, for purposes of Coventry's motion, the Court will modify the restrictive covenant to encompass Ingrassia' former territory only. *See, e.g., Alexander v. Alexander, Inc. v. Drayton*, 378 F. Supp. 824, 832 (E.D. Pa. 1974) (finding geographic restriction in covenant need not extend past 100 miles outside of Philadelphia and modifying covenant accordingly).

2.    *Ingrassia's Business Activities*

Having found that the covenant, as modified, is valid, the Court now turns to the question of whether Ingrassia's business activities have actually violated its terms.

16

a.      Competition and Interference

The Court finds that Coventry is likely to succeed on the merits of its claim that Ingrassia has violated the non-compete and non-interference clauses.  While employed at Coventry, Ingrassia referred at least one producer to Wolfkiel in connection with a case worth $15 million.  (R. at 104-05, 235-36 (June 24, 2005).)  Coventry, in turn, lost its opportunity to close on that case when Wolfkiel sold it to one of Coventry's competitors.  (*Id.* at 106-08.)  This referral, therefore, was likely in violation of the non-interference clause, which prohibits Ingrassia from interfering with Coventry's "existing or prospective relationships."  (Def.'s Hr'g Ex. C ¶ 4(b).)  Moreover, since leaving Coventry, Ingrassia has become involved in Wolfkiel's firm and has received "gifts" from Wolfkiel in anticipation of conducting future business together.  (Def.'s Hr'g Ex. F; Wolfkiel Dep. at 26-28.)  Wolfkiel admits that, before this lawsuit was instituted, he was considering the life settlement industry as one area where Ingrassia "might fit within [his] group." (Wolfkiel Dep. at 13-14.)  Had Wolfkiel and Ingrassia continued down this path, Ingrassia would have "engaged in" the life settlement industry in violation of the non-compete clause.  (Def.'s Hr'g Ex. C ¶ 4(a).)

b.      Confidentiality

There is nothing to suggest, however, that Ingrassia has violated or is likely to violate the confidentiality clause.  Ingrassia testified that, while he did obtain certain confidential information from Coventry during his employment, he has since returned all of those materials to the company.  (R. at 172, 198-99 (June 24, 2005).)  The three-ring binders were the only items which Ingrassia did not immediately turn over, and his failure to do so was unintentional.  (*Id.* at 199.)  Ingrassia contends that he has no remaining documents and Coventry has done nothing to refute this contention.  *See, e.g.*, *Siemans*, 167 F. Supp. 2d at 763 (denying employer's request for injunction

directing former employee to return all information, documents, software, materials, work product and equipment, in light of uncontroverted testimony that employee did not remove any such material).

Insofar as "intangible" knowledge is concerned, Coventry has not shown that Ingrassia possesses any special skills or know-how beyond his ability to build relationships. As stated earlier, Ingrassia's central task at Coventry was to schmooze and find life settlement opportunities, not to master the art of pricing and underwriting. (*Id.* at 181, 191-92.) Ingrassia's ability to meet and work well with people, while relevant to Coventry's customer goodwill, cannot be considered "confidential." *See, e.g.*, *Fonda Group, Inc. v. Erving Indus., Inc.*, 897 F. Supp. 230, 233 (E.D. Pa. 1995) ("management and selling skills" did not constitute "publicly unavailable data or valuable confidences"); *see also Hennon*, 699 A.2d at 1275 (a trade secret "does not include a worker's aptitude, his skill, his dexterity, his manual and mental ability, and such other subjective knowledge as he obtains while in the course of his employment"). Indeed, if this skill could be branded "confidential," it would be absurd and impossible to prevent Ingrassia from using it for the rest of his life. (*See* Def.'s Hr'g Ex. C ¶¶ 4(c)(ii), 4(c)(iii) (stating that confidentiality clause applies for an unlimited time period).) There is simply no conceivable way for this Court to forever preclude Ingrassia from using his people skills. Regardless, Ingrassia began developing this ability before joining Coventry and indicated that Coventry's "very general" training program did little to enhance it. (*See* R. at 215 (June 24, 2005).) Thus, there is no reason to believe that Ingrassia either possesses the company's confidential information or will somehow misuse that information.

In sum, the Court finds that Coventry is likely to prevail with respect to the non-compete and non-interference clauses, but unlikely to prevail with respect to the confidentiality clause. The preliminary injunction, therefore, shall not encompass the subject of confidentiality.

**B.      Irreparable Injury**

The second prerequisite to a preliminary injunction requires the Court to determine whether Coventry will suffer irreparable harm if its motion is denied. "Irreparable harm is injury that cannot adequately be compensated by monetary relief." *Analytic Recruiting, Inc. v. Analytic Res., LLC*, 156 F. Supp. 2d 499, 519 (E.D. Pa. 2001); *see also Morton v. Beyer*, 822 F.2d 364, 372 (3d Cir. 1987). Pennsylvania courts have indicated that interference with customer relationships satisfies the irreparable harm requirement. *John G. Bryant Co.*, 369 A.2d at 1167. Indeed, as one court has stated, "[b]ecause the violation of a covenant not to compete results in interference with customer relationships causing nonquantifiable damages, such covenants are prima facie enforceable in equity." *Sparks Tune-Up, Inc. v. White*, Civ. A. No. 89-664, 1989 WL 41321, at *2, 1989 U.S. Dist. LEXIS 4216, at *4 (E.D. Pa. Apr. 18, 1989).

Coventry has demonstrated a threat to its customer relationships. (*See supra* Part III(A)(2)(a).) Specifically, Coventry has shown that Ingrassia's involvement with Wolfkiel is likely to constitute "unwarranted interference" with its producers that is "not capable of being fully compensated by money damages." *See John G. Bryant Co.*, 369 A.2d at 1167. In making this showing, Coventry has proven irreparable harm.

**C.      Balance of Harms and the Public Interest**

Lastly, the Court must consider the relative hardship that may be imposed on the parties by the grant or denial of preliminary relief, as well as the impact on the public. *See KOS Pharms.*, 369

F.3d at 708.  For the most part, the relative harms have already been weighed in assessing the validity of the restrictive covenant and making the decision to modify that covenant.  *See Siemans*, 167 F. Supp. 2d at 760 (determining whether to enforce such a covenant requires the court to "balance the interest the employer seeks to protect against the interest of the employee in being able to earn a living in his chosen occupation").  The covenant, as modified, does not unduly burden Ingrassia, for it only places restrictions on his livelihood within a five-state region for three years and, even there, allows him to work in any field except for the life settlement industry.  Both Coben and Buerger believe that Ingrassia has the ability to earn a living outside the world of life settlements.  (R. at 28, 113 (June 24, 2005).)  Ingrassia's prowess as a "relationship guy" buttresses this conclusion.  (*Id.* at 23, 97, 180-81.)  By contrast, given the importance of customer contacts to Coventry's business (*see id.* at 10, 80-81, 93), Coventry could suffer significant harm unless the modified covenant is enforced.

The Court also finds that granting preliminary enforcement of the covenant is in the public interest.  It is true that, as a matter of public policy, Pennsylvania courts are reluctant to "enforce any contracts in restraint of free trade, particularly where they restrain an individual from earning a living at his trade."  *Brobston*, 667 A.2d at 733 (*citing Martucci*, 136 A.2d at 846)).  Nonetheless, "it is generally in the public interest to uphold an agreement freely entered into by the parties."  *Vector Security, Inc. v. Stewart*, 88 F. Supp. 2d 395, 401 (E.D. Pa. 2000) (citation omitted).  Because this covenant has been modified so as to avoid any undue restraints on Ingrassia, a preliminary injunction will not be contrary to public policy.  Instead, such an injunction will further the public interest by "protecting legitimate business interests that are recognized under Pennsylvania law," most

20

especially, Coventry's "interest in customer goodwill." *Hillard v. Medtronic, Inc.*, 910 F. Supp. 173, 179 (M.D. Pa. 1995) (*citing Sidco Paper Co.*, 351 A.2d at 252-53).

Accordingly, the four prerequisites to a preliminary injunction demonstrate that Coventry is entitled to at least some of the relief requested.


IV.     **CONCLUSION**

For the reasons stated above, Coventry's motion for a preliminary injunction is granted in part and denied in part.  Ingrassia is preliminarily enjoined from personally engaging in the life settlement business and referring life settlement business to others in Colorado, Wyoming, Nebraska, Kansas, or Missouri for a period of three years from the date of his termination.  An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **COVENTRY FIRST, LLC,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **J. PATRICK INGRASSIA,** | : | **No.  05-2802** |
| **Defendant.** | : | |

## ORDER

_____**AND NOW**, this **11th** day of **July, 2005**, upon consideration of Plaintiff Coventry First, LLC's ("Coventry") Motion for a Temporary Restraining Order (Document No. 3), Coventry's Motion for a Preliminary Injunction (Document No. 4), Defendant J. Patrick Ingrassia's response thereto (Document No. 19), following an evidentiary hearing on June 24, 2005, and for the foregoing reasons, it is hereby **ORDERED** that:

1.  A **PRELIMINARY INJUNCTION** is issued against Ingrassia, the terms of which are as follows:  For a period of three (3) years from December 3, 2004, the date of his termination, Ingrassia shall not personally engage in the life settlement business nor refer life settlement business to others in Colorado, Wyoming, Nebraska, Kansas, or Missouri.

    a.  The term "life settlement business" shall encompass offering, soliciting, providing references for, negotiating, procuring, effectuating, purchasing, investing, financing, monitoring, tracking, underwriting, selling, transferring, assigning, pledging, hypothecating, and receiving compensation in connection with life settlement contracts.

b. The term "life settlement contract" shall mean a written agreement establishing the terms under which compensation or anything of value will be paid, which compensation or value is less than the expected death benefit of the insurance policy or certificate, in return for the viator's assignment, transfer, sale, devise or bequest of the death benefit or ownership of any portion of the insurance policy or certificate of insurance.  A life settlement contract also includes a contract for a loan or other financing transaction with a viator secured primarily by an individual or group life insurance policy, and an agreement with a viator to transfer ownership or change the beneficiary designation at a later date regardless of the date that compensation is paid to the viator.

c. The term "viator" shall mean the owner of a life insurance policy or a certificate holder under a group policy who enters or seeks to enter into a life settlement contract, and shall not be limited to an owner of a life insurance policy or certificate holder under a group policy insuring the life of an individual with a terminal or chronic illness or condition.

2. In the event Ingrassia locates any additional confidential information and materials given to him by Coventry during the period of his employment with Coventry, Ingrassia shall, within ten (10) days of locating any such additional confidential information and materials, return all such confidential information and materials to Coventry, in care of its counsel of record.

3. In all other respects, Coventry's Motion for a Preliminary Injunction is **DENIED**.

4.      Coventry's Motion for a Temporary Restraining Order is **DENIED** as **moot**.


**BY THE COURT:**

**Berle M. Schiller, J.**